# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **BLAKE** and **JENNA MILLER**, Individually and on Behalf of **C.M.**, a Minor Child,<br><br>Plaintiffs<br><br>v.<br><br>**UNITED STATES OF AMERICA**,<br><br>Defendant | Case Number<br>2:19-cv-01293-APG-VCF<br><br><br>**REPORT OF GUARDIAN AD LITEM** |

<u>GUARDIAN AD LITEM RECOMMENDATION
TO SETTLE CASE ON BEHALF OF
C.M.</u>

Chip Evans was appointed by the court as Guardian Ad Litem for C.M. (DOB XX/XX/2015) and files this recommendation that the Court approve the settlement on his behalf, and would show the Court the following:

## Summary of the Incident

1. This case arises out of the negligence during the pregnancy, labor and delivery, and resuscitation of C.M. His mom, Jenna Miller, presented to Government providers on September 7, 2015, after she noticed decreased fetal movement. She was 34 weeks pregnant at the time. They placed Mrs. Miller on an electronic fetal monitor until emergent c-section delivery.

2. In between, it is alleged that Government providers negligently failed to intervene as the electronic fetal monitor showed that C.M. suffered oxygen deprivation (asphyxia). Once C.M. was delivered, the Government discovered multiple chorioangiomas, masses that shunted blood, and thus oxygen, away from C.M. throughout pregnancy. And when they turned their attention to C.M., they discovered he was largely lifeless, severely anemic, and it is alleged that they failed to properly resuscitate him by getting him the oxygen he needed.

3. When the fetus is deprived of oxygen (hypoxia) as a result of a restriction in oxygenated blood (ischemia), global brain damage (encephalopathy) results. Where the asphyxia occurs during childbirth, it's known as an intrapartum injury. HIE, in turn, causes cerebral palsy (CP) and its associated disabilities.

4. C.M. was born at 1706, almost three hours after his mother arrived at the hospital. He came out pale and inactive. During the cesarean section, meconium fluid appeared when

       Ms. Miller's membranes ruptured—another indication of intrapartum fetal distress. The placenta had four discrete solid masses and the pathology report confirmed six chorioangiomas ranging in size from 3.5 to 10.1 cm. There were also markedly increased nucleated red blood cells, increased stromal cellularity, focal increased syncytial knots, and the entire uterus was slightly "levorotated."

5. Experts likened C.M.'s Apgar scores at birth to those of a "dead baby." Dr. Rowe acknowledged that it simply "can't get worse than" C.M.'s scores; he was delivered unresponsive and pulseless. His core blood gases produced equally troubling results and were consistent with metabolic acidosis. C.M. coded just one minute after birth.

6. By five minutes of life, providers knew C.M. was in severe respiratory distress. By 24 minutes of life, providers note C.M. was very pale and still not moving. His complete blood count (CBC) revealed severe anemia and metabolic acidosis, consistent with severe hypoxic-ischemic brain damage.

7. It is alleged that C.M. should never have been delivered at MOFMC—that hospital was unequipped to handle C.M.'s condition at birth. For instance, because Ms. Miller presented at 34 weeks and she had a history of anemia, she was a high-risk pregnancy. MOFMC's policies and procedures require high-risk pregnancies to be delivered at a facility with a NICU. The allegation is that MOFMC should have done two things: 1) arranged for a Neonatal Intensive Care Unit (NICU) team to be present at birth or 2) transferred the Millers to nearby University Medical Center (UMC). Neither happened. Instead, a NICU team from UMC arrived at 1813, an hour and seven minutes after birth.

8. And for C.M.'s first hour and seven minutes of life, MOFMC worked to keep him alive. Drs. Zilinski and Church started CPR with PPV at one minute of life and continued until

15 minutes of life. At four minutes of life, they attempted, to place an ET tube but it didn't work. It took eight minutes for MOFMC to successfully place an ET tube. It took 20 minutes of life for a pediatrician to arrive.

## SETTLEMENT & DISBURSEMENT

1. Plaintiffs' case settled for $5,000,000, subject to the Court's approval. Plaintiff Blake Miller is the biological father of Colton Miller, and Jenna Miller is the biological mother. The settlement is being apportioned so that half of the funds are going into a Reversionary Annuity and the remaining half are being used to satisfy fees and expenses, with the remainder after fees and expenses being placed in a Special Needs Trust for the benefit of the minor. The expenses total $152,429.46. The breakdown is as follows:

   Total Settlement: $5,000,000.00

   Reversionary Annuity Amount: $2,500,000.00

   Attorney Fee: $1,250,000.00

   Expenses: $152,429.46[1]

   Payable to Parents: $50,000.00

   Remainder to Special Needs Trust: $1,047,570.54

## Analysis

---

[1] It is this counsel's understanding that these expenses are an estimate. Minor outstanding expenses may be incurred with the finalization of the settlement. (E.g., travel to any approval hearing, finalization of expert fees, wiring fees, interest, etc.) This counsel recommends to the Court to approve the settlement and costs as reasonable and necessary, including the likely upcoming charges as well.

2. I have spoken to Blake and Jenna who stated that they fully understand the settlement for C.M.  They fully understand that they do not have to settle any of their claims, and that they could proceed to trial.  They understand that a jury might award their child more money than they are settling for, but they further understand that a jury may award less money, no money, or something very close to this settlement. They understand that by entering into this settlement, they are waiving not only their own right to a trial, but that they are also waiving C.M.'s right to a trial. They understand that neither they, nor C.M. can ever come back against this Defendant for more money for anything resulting from this incident once the Court approves this settlement.  They understand the finality of their decision and this settlement.  They agree with the settlement and distribution of funds and believe both to be in their child's best interest.

3. Trial in this matter poses a risk for Plaintiffs given the amount of the settlement offer and the proposed distribution.  Even if Plaintiffs were to establish liability at trial, the additional fees and expenses would negate anything but a substantial gain and perhaps result in a net recovery to the minor of less than the current settlement.  In order to net the same amounts, a verdict would need to be appreciably higher than the settlement to net the same result, given the anticipated increase in fees and expenses. I believe that the likelihood of an appreciably higher verdict in this case is minimal.  The family wants the case closed and is ready to move on.

4. The division of the settlement is also appropriate.  The attorney's fees and expenses are both reasonable.

5. Based on the foregoing, I believe the proposed settlements are in C.M.'s best interest.  Further, I believe that the proposed settlement breakdown is fair and that the structures are

appropriate for C.M. Based on the foregoing, I would respectfully request that this Honorable Court enter a Final Judgment approving the proposed settlement and breakdown including the attorney's fees, case expenses and structures.

## Review

6. In order to analyze the settlement in light of the best interest of C.M., I performed the following:

   a. Review of pleadings in the matter;
   b. Review of medical history of C.M.;
   c. Review of life care plan for C.M.;
   d. Had several phone conversations with counsel for Plaintiff;
   e. Reviewed the Stipulation of the Government;
   f. Reviewed the proposed disbursement;
   g. Had a Zoom phone interview with Blake and Jenna Miller;
   h. Reviewed the draft documents;
   i. Drafted this Report; and
   j. Will attend any Final Hearing(s) on the matter as the Court deems necessary.

## Attorney's Fee & Expense

7. My fee to date totals $3,000.00 and my expenses total $0.00. I hereby request a Guardian Ad Litem fee of $3,000 payable by Plaintiffs.

Respectful Submitted:

By: /s/ Chip Evans

Walter P. "Chip" Evans, IV
TX State Bar No. 24002068

1
2          Evans and Herlihy Law Firm
3          4407 Bee Caves Road, Suite 611
4          Austin, TX 78746
5          (512) 732-2727 Tel
6          (512) 732-2731 Fax
7          chip@evanstxlaw.com

# CERTIFICATE OF SERVICE

By my signature above, I certify that a copy of this pleading, Plaintiffs' Motion, has been sent to the following on January 25, 2022 via the Court's CM/ECF notice system.

        Brianna Smith
        U.S. Attorney's Office
        501 Las Vegas Blvd South
        Suite 1100
        Las Vegas, NV 89101-
        702-388-6533
        Brianna.Smith@usdoj.gov

        Attorney for the Defendant

        JAMAL K. ALSAFFAR,
        jalsaffar@nationaltriallaw.com
        Texas State Bar #2402719
        TOM JACOB,
        tjacob@nationaltriallaw.com
        Texas State Bar #24069981

        WHITEHURST, HARKNESS,
        BREES, CHENG, ALSAFFAR,
        HIGGINBOTHAM, & JACOB P.L.L.C.
        1114 Lost Creek Blvd., Suite 410
        Austin, Texas 78746
        (512) 476-4346 (o)
        (512) 467-4400 (f)

        Danial Laird
        dan@lairdlaw.com
        Nevada Bar #11831
        Laird Law PLLC
        8991 West Flamingo Road, Suite C,
        Las Vegas, NV 89147
        (702) 202-3091 (o)

        Attorneys for the Plaintiffs